## Allentown Supply Corporation v. Stryer

*Harry P. Creveling* and *David Freeman*, for plaintiff.

*John P. Thomas*, for defendant.

SCHEIRER, J., August 21, 1962. — On October 26, 1959, plaintiff and defendant entered into a contract wherein plaintiff agreed to furnish and install a heating and air conditioning system in defendant's warehouse. Plaintiff's suit in assumpsit is for the balance due on the heating system and for profits on the air conditioning system which was not installed. Defendant filed a counterclaim for costs expended to rectify the heating system. The jury found for defendant in plaintiff's suit and for plaintiff in defendant's counterclaim. Plaintiff filed motions for a new trial and judgment n.o.v.

The contract above referred to was in the form of a letter of proposal from plaintiff to defendant which the latter signed following the word "accepted". The proposal used the terminology "we will furnish and install" followed by the trade name of the heating and air conditioning equipment. At defendant's suggestion, the following guarantee was added to the phraseology

describing the heating proposal: "We guarantee to heat said building to a temperature of 70° at zero weather." The cost of the installation of both heating and air conditioning equipment was $14,315. The figure of $15,515 was crossed out and the letter began with the words: "As per your request we are pleased to requote on the above mentioned project."

It is admitted that defendant paid $7,000 on account of the contract price. In addition, plaintiff claims $2,-321.30 allegedly due for materials and labor and $3,-019.00 for loss of profit. The estimated cost of labor and materials according to plaintiff's testimony was $11,296 which subtracted from the contract price of $14,315 leaves $3,019 designated "profit". Plaintiff's Exhibit B attached to its statement of claim reveals labor and materials furnished in the amount of $9,-321,30 which would leave a balance owing of $2,321.30 after a credit of $7,000 paid by defendant is given. It would thus appear that the cost of labor and materials not provided would be $1,974.70, but the full profit of $3,019 is claimed.

Defendant filed a counterclaim for the sum of $3,-797 based upon plaintiff's failure to perform the contract and the resultant cost to defendant of correcting the system. The total proved by defendant and submitted to the jury was $2,242.35.

The only reasons filed by plaintiff in support of its motion for a new trial were the following:

"1. The verdict was against the evidence.

"2. The verdict was against the weight of the evidence.

"3. The verdict was against the law.

"4. The failure of the Court to charge Point 1 of Points for Charge and Binding Instructions."

The points for charge and binding instructions were: (1) "Under the evidence the verdict must be

for the plaintiff"; (2) "Under the law the verdict must be for the plaintiff". No additional reasons for a new trial were filed within 15 days, nor to this day, after the filing of the notes of testimony.

Our review of the testimony and plaintiff's brief leads us to the conclusion that the evidence presents issues of material facts for the jury.

"Since the statute authorizing the granting of a judgment n.o.v. was not intended to authorize the court to invade the province of the jury, it is very well established that if the evidence on a material point presented an issue of fact for decision by the jury, a motion for a judgment n.o.v. is improper. It follows that if there is a conflict of testimony upon a material point, such a situation not only does not furnish a ground for a judgment n.o.v., but the court is precluded, by such conflict, from entering such a judgment, . . .

"Obviously, if there is reasonable support in the evidence for the verdict which was rendered, and if the verdict is otherwise lawful, a motion for a judgment n.o.v. will not be granted, the weight of the evidence being for the jury, and the proper remedy, if it be thought that the verdict is contrary to the weight of evidence, being not a motion for a judgment n.o.v., but a motion for a new trial.

"As to whether there is reasonable support in the evidence for the verdict, it may be noted that the evidence may be found sufficient, though it be meager or uncorroborated": 20 P. L. Encyc. Judgment, §145.

Accordingly, since there are issues of material facts in this case, the motion for judgment n.o.v. is improper and will be refused.

Should we find that the verdict was capricious or was against the weight of the evidence and resulted in a miscarriage of justice, it would be our duty to grant a new trial: Bohner v. Eastern Express, Inc., 405 Pa. 463, 175 A. 2d 864. We cannot so find.

An examination of the testimony will reveal many conflicts as to material issues which were submitted to the jury. We shall attempt to pin-point the relevant conflicts as we review the testimony.

Work was begun by plaintiff on November 13, 1959, and, according to defendant, substantially completed by December 13, 1959. Plaintiff does not agree that the installation was substantially completed on December 13 and we shall present its reasons later. The warehouse was almost completed either by December 10, 1959, or December 18, 1959. The letter of proposal was brief and lacking in detailed specifications. Nor was the exact time mentioned when the guarantee to heat the building at 70 degrees in zero weather was to take effect. Considerable conflict occurred over the location of the unit heaters. Counsel for plaintiff in his brief said:

"It is important to note at this point that C. Lewis Stryer is a builder with vast experience, and it is inconceivable that Mr. Stryer should sign a contract for the installation of a $14,000.00 heating and air-conditioning system without approving plans showing the *design of installation.*" It seems clear, however, that defendant did sign the contract without approving a "design of installation". The testimony of plaintiffs is that defendant submitted a plan of the building which had the location of the unit heaters marked for the center of the warehouse. The plan was prepared by an engineer, not called as a witness, but who informed the court following our inquiry that it was to be used for the purpose of securing approval of the Department of Labor and Industry and that the heat unit locations were not placed on the plan by him. Further, the height of the heaters was not indicated on the plan. There was no reference in the contract to the plan. Defendant made a statement that is contradictory to plaintiff's position that he, defendant, knew the "design of installation". He said:

"A. Well, since Allentown Supply never gave me any indication of where they were going to hang these heaters, I took it for granted they knew what they were doing and since they made a guarantee of 70 degrees at zero, I wasn't too much worried as to what their activities were going to be. So I happened to come over one morning and I saw them hanging the heaters down about 12 feet from the floor.

"Q. About when was that, please?

"A. Approximately November 13th.

"Q. 1959?

"A. 1959."

After three unit heaters were installed in the center of the building at a height of 13 feet (it was testified by plaintiff that hanging the units in this manner was common practice), defendant said he requested that the heaters be placed on the perimeter of the building because of his view that the suspended heaters with steam pipes below them would limit the use of the floor space to one side only. Defendant testified that the distance between the steam pipes and the floor would be about eight or nine feet. Defendant further expressed his doubts as to whether the building could be heated to a temperature of 70 degrees as guaranteed. Mr. Wasser, an employe of plaintiff, testified that defendant requested the units to be raised. Thereafter, plaintiff raised the heaters to a height of 16 to 17 feet prior to December 10th. As stated before, the heating system was substantially completed by December 13th. The air conditioning work had not been instituted by this date. The floor of the warehouse had not been concreted by then and a tarpaulin hung over a door. On December 16th, an engineer, Bowman, visited the premises at the request of defendant. At the thermostat level, 54 inches, he found the temperature to be 44 degrees. It was considerably less at floor level and "unbearable" in the ceiling area. On December 16th, the outside temperature was above zero at the freezing

level. It was this engineer's opinion that the building could not be heated to a temperature of 70 degrees with the units in the center. His recommendation was that the units be placed along the perimeter and cited the suggestion of a heating manufacturer (Kritzer) other than the one involved in the contract but whose heating units were installed. To do this would eliminate stratification and produce better circulation.

There was a clear difference of testimony between plaintiff's and defendant's witnesses as to whether the thermostat was ever set at 70 degrees. Plaintiff's witnesses testified they never saw the thermostat set at 70 degrees and one of defendant's employes was quoted as saying he turned the thermostat off at night to save fuel. Defendant himself testified that the thermostat was set at 70 degrees and the plant was run at that temperature continuously. The temperature then at 18 inches off the floor was 38 degrees. When the thermostats were placed at 4½ feet, the temperature was 56 degrees to 58 degrees. At the ceiling level the temperature was much higher, possibly 100 degrees. Defendant further testified that at no time after December 10, until the system was altered, did the temperature rise to 70 degrees. The outside temperature during the winter of 1959-1960 was termed "mild".

On January 7, 1960, another engineer, Coughlin, visited the warehouse at defendant's request. He testified that one of the basic difficulties of the heating system was that the unit heaters were not properly projecting the air throughout the building; that there was a deficiency in air distribution. He made four recommendations as follows:

"Item 1. Increase the air quantity and velocity of the present units by increasing the fan type speed and motor horsepower.

"Item 2. Add four-way louvers and nozzles to the discharge side of the unit heaters.

"Item 3. Provide additional downblow unit heaters at the center of the several bays to project to the floor level.

"Item 4. Provide additional unit heaters at the perimeter of the building."

Plaintiff called as an expert a heating engineer, Scattene, who was refused admission to defendant's warehouse, but after hearing testimony in the case and looking at the plans, testified that it was common practice to place heating units in the center of buildings used for warehouse purposes.

Defendant stated that after December 10th, he called plaintiff "constantly" without result. He made about 30 calls between December 10th and the time when defendant sought legal assistance in February. Then a series of letters were exchanged between counsel for the parties. Defendant demanded that the heaters be placed along the walls and plaintiff replied it would be willing to do so if paid for the change. Plaintiff agreed to make minor corrections having to do with the condensate tank which would be replaced. On April 14, 1960, defendant's counsel advised plaintiff's counsel by letter that because plaintiff failed to meet its guarantee of 70 degree temperature, the contract would be terminated. Defendant testified that plaintiff did nothing to correct defects between December and April. The employe of plaintiff in charge of the installation testified that he was told not to re-enter the warehouse after December 13th, and therefore was unable to make corrections in the system. He was somewhat vague, however, as to who was responsible for telling him not to enter the warehouse. Defendant said he did not bar plaintiff from entering the building to correct the heating system, but admitted he told plaintiff not to install the air conditioning until the heating system was corrected.

In January, 1960, defendant laid a concrete floor in the warehouse and in order to place the heat units along the wall, a piping system was placed under the floor. The pipes were begun to be laid in the last week of December. Plaintiff delivered a new condensate tank to defendant's premises and defendant insisted on installing it himself. In May, 1960, after cancellation of the contract defendant removed everything plaintiff installed except the boiler. The unit heaters were mounted on the walls as were the thermostats. Defendant testified that the heating system worked satisfactorily during the winter of 1960-1961.

Plaintiff makes a strong argument that defendant changed the method of installation of the head units from one level to another and finally to the perimeter of the warehouse. The letter of proposal did not include specifications as to the details of installation and it is not clear that a plan showing the location of the heat units was given to plaintiff by defendant. At any rate, there was diverse testimony on this point and this became a jury question. Further, plaintiff argues since defendant ordered a relocation of the units, plaintiff was relieved of his guarantee of providing 70 degree temperature. Assuming that there was an understanding as to the location of the heat units, when defendant ordered them relocated there is no evidence that plaintiff sought or in fact received a release of its guarantee of temperature. Plaintiff has cited the case of Riebe v. Mauch Chunk Water Co., 33 Pa. Superior Ct. 321, for the proposition that plaintiff contractor was bound to construct according to the directions given him, and his obligation did not bind him for the efficiency of the plan adopted.

In this case, however, plaintiff was provided with detailed specifications and the work was supervised by a representative of defendant. This cannot be said of our case; the only provision that approximated a

specification was the pencilled notation as to the location of the heat units on the plan of the warehouse and it is not clear that such a plan was provided by defendant to plaintiff. Defendant in the instant case, did not supervise the work; he only intervened at a point when he thought the temperature guarantee was not being met. As stated earlier, the plaintiff did not secure a release when the defendant changed the height of the heat units; it did what it was told and gave no notice that the guarantee was abandoned. In the Riebe case, the question of plaintiff's performance according to the plans was submitted to the jury as it was in our case. Whether the plaintiff performed according to the agreement of the parties, whatever that agreement was, was left to the jury. Interestingly, the jury in the Riebe case gave the plaintiff less than his claim and, therefore, it may be inferred credit was given to the defendant for plaintiff's delay in performance, a condition set forth in clear specifications. In our case, the jury gave similar credit to the plaintiff, presumably for plaintiff's failure to meet the temperature guarantee.

Plaintiff also cites Canuso v. Philadelphia, 326 Pa. 302, 309, where there was evidence that defendant's engineers had complete control over the plans for the erection of the work in question. The court said: "Under such circumstances a contractor, even though a specialist, who builds according to the owner's plans, is not responsible for the sufficiency of the work." As in the Riebe case, the Canuso case may be differentiated from ours in that detailed specifications and plans were included in the contract. It cannot be said in our case that defendant had complete control over the heating plans as in the Canuso case. We again point out that plaintiff was practically on his own as to the manner of construction. We cannot overlook the persistent and ever present guarantee which plaintiff per-

mitted to continue in existence in the face of changed plans, if plans there were.

Plaintiff complains that the tests of its heating system were premature in that on December 13th when its work was substantially completed, there was no concrete floor laid; a tarpaulin was over a door; the office area had not been enclosed from the rest of the building; and, finally, the capacity of the B.T.U.'s were not sufficient because the heating coil in the air conditioning unit with a capacity of 240,000 B.T.U.'s had not been installed. The contract did not provide at what point plaintiff was to be bound by its guarantee. Common sense would dictate that it be applied upon "substantial completion" of the structure and the heating system. One of the engineers testified that the presence of a tarpaulin over the door was not a serious factor. The ground floor would have no effect on distribution of the heat. The fact that the 240,000 B.T.U.'s in the heating coil of the air conditioner were not present could hardly have had a serious effect on the overall picture in view of the testimony that the installed B.T.U.'s were in excess of the heat loss. The office area was within the main structure, so the fact that it was not enclosed would have little effect. The laboring of the heating system, the hot units, the high temperature at high levels and the low temperature at ground level must be borne in mind. All of this was presented to the jury for its consideration.

We are of the opinion that the basic issues in the case were fairly submitted to the jury. We said in our charge:

"Now, we would say to you that the plaintiff cannot be charged with breach of contract if the defendant wrongfully refused the plaintiff permission to perform the contract as contemplated under the terms of the contract. It will be for you to determine whether or not the defendant made it impossible for the plaintiff

to complete the contract, certainly the plaintiff cannot be blamed for it.

"The defendant, on the other hand, says that when the work was completed in about the middle of December, that it was clear to them the building was not being heated to 70 degrees in zero temperature or, for that matter, when the temperature was higher than zero, because during that winter the temperature did not go down to zero.

"It will be recalled that the defendant complained very early about the manner in which the unit heaters were hung, and it was under his orders that the units were raised from around 12 feet to around 16½ feet. It would then appear that the heating system did not do the job it should have, and some of the engineers said that was the result of the height of the unit heaters. It is for you to determine whether or not the defendant had a right to say that the plaintiff did not meet its warranty of 70 degrees temperature in zero weather.

"Did the defendant act too quickly? Did the defendant take the situation into his own hands without permitting the plaintiff to make the adjustments, or did the defendant have the right under the circumstances to conclude that the plaintiff had failed in its warranty and that he was therefore justified in taking steps to rectify the heating system?"

The facts were presented to the jury in considerable detail by the court so that all relevant conflicting issues might be brought to its attention. The case was not an easy one for a jury to consider. It is our judgment that the difficulties of the parties in this matter and the resultant complexity of issues for the jury were due in the main to the failure of the parties to make specific the details of their agreement. It is obvious that the bid of the plaintiff was at rock bottom evidenced by the crossing out in the contract of the figure of $15,-

515 and the substitution of $14,315, as well as the opening sentence in the letter of proposal: "We are pleased to requote." Plaintiff was anxious for the business and defendant equally anxious for a low price. Detailed specifications and a more generous explanation of the guarantee of 70 degrees temperature would have spared the parties this unfortunate conflict.

The verdict of the jury was a draw as to the claims of plaintiff and defendant. Eliminating the element of profit sought on plaintiff's side, the common sense of the jury is apparent. The claim of plaintiff would then be $2,321.30 and the counterclaim of defendant was $2,242.35, a difference of $78.95. Plaintiff did not prove any loss with respect to the air conditioning system; there is no evidence that it was purchased by plaintiff. The question of whether plaintiff was entitled to a profit was submitted to the jury in what we believe to be clear language and considering all phases of the case, particularly the testimony of defendant that he called plaintiff 30 times to correct the defects in the system and that the door was open between December and April for plaintiff to come to the warehouse and make appropriate adjustments, the elimination of profit from plaintiff's claim is understandable.

Plaintiff complains of the qualifications of expert witnesses called by defendant and the unlikelihood of defendant's story, but it is hornbook law that the credibility of witnesses is for the jury.

There was only a general exception to the court's charge by plaintiff and no errors in the charge were made the basis of the rule for a new trial. Where the errors, if any, in the charge are not basic and fundamental, they must be made the subject of specific objections and cannot be complained of under a general exception to the charge: Medvidovich v. Schultz, 309 Pa. 450, 453; Cunningham v. Spangler, 123 Pa. Superior Ct. 151. An assignment, as a reason for a new

trial, that the jury's verdicts were against the evidence is applicable only when there is no conflict in the testimony: Landis v. Conestoga Transportation Company, 349 Pa. 97, 36 A. 2d 465. The weight of the evidence is primarily for the jury: Hindes v. Pittsburgh, 155 Pa. Superior Ct. 314, 38 A. 2d 420.

We cannot say that the jury's verdict was capricious or against the weight of the evidence or resulted in a miscarriage of justice; therefore, the verdict will be allowed to stand.

### Order

Now, August 21, 1962, plaintiff's motions for judgment n.o.v. and for a new trial are denied and judgment may be entered upon the verdict for defendant in plaintiff's suit and for plaintiff in defendant's counterclaim.